**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PRINCETON INDUSTRIAL,** | ) | |
| **PRODUCTS, INC., an Illinois** | ) | |
| **corporation,** | ) | |
| | ) | |
| **Plaintiff,** | ) | No. 13 C 7160 |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **PRECISION METALS CORP.,** | ) | |
| **a New York corporation,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

The parties in this case entered into a contract calling for plaintiff, Princeton Industrial Metals

("Princeton") to supply certain machined parts for the defendant, Precision Metals Corp. ("PMC")

to use in weapon mounts it was producing for the United States government. This went along

smoothly for about two years. Then, on July 21, 2010, the buyer for PMC, Rose Schleifer, sent an

email to Kendall Knapik of Princeton with "a schedule for [PMC]" for June through December. The

schedule represented an increase in the quantity of parts that PMC had ordered from Princeton. As

such, PMC's buyer wrote, "[l]et me know if there will be any problems meeting this schedule." [Dkt.

# 12-2, at 65]. Apparently, there were not, as Princeton provided the new numbers, and PMC paid

for the shipments in due course – for over a year. But, after September 26, 2011, PMC made no

further payments. Defendant has refused to pay the outstanding balance of $100,660.09. Plaintiff

has sued under theories of breach of contract and unjust enrichment. The defendant moved for

summary judgment, but was unable to prove there was no genuine issue of fact precluding a

judgment in its favor. *See Princeton Industrial Products v. Precision Metals*, 2015 WL 1810319 (N.D.Ill. 2015). Now, the plaintiff seeks summary judgment in its favor.

## I.

### A.
### Summary Judgment

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In a summary judgment proceeding, a court may not weigh the evidence or decide which inferences should be drawn from the facts. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Still, "a factual dispute is 'genuine' only if a reasonable jury could find for either party." *Rosario v. Brawn*, 670 F.3d 816, 820 (7th Cir. 2012)(citation omitted). To survive summary judgment, a non-moving party must "show through specific evidence that a triable issue of fact remains on issues for which the nonmovant bears the burden of proof at trial." *Knight v. Wiseman*, 590 F.3d 458, 463-64 (7th Cir. 2009)(citation omitted). The evidence the nonmovant submits in support of his position must be "sufficiently strong" that a jury could reasonably find for the nonmovant. *Id.*

### B.
### Summary Judgment Under Local Rule 56.1

As always, the facts underlying this summary judgment proceeding are drawn from the parties' Local Rule 56.1 submissions. "For litigants appearing in the Northern District of Illinois, the Rule 56.1 statement is a critical, and required, component of a litigant's response to a motion for summary judgment." *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 398 (7th Cir. 2012). Local Rule

56.1 requires a party seeking summary judgment to include with its motion "a statement of material facts as to which the ... party contends there is no genuine issue and that entitle the ... party to a judgment as a matter of law." Local Rule 56.1(a)(3); *Ciomber v. Cooperative Plus, Inc*., 527 F.3d 635, 643 (7th Cir. 2008). Each paragraph must refer to the "affidavits, parts of the record, and other supporting materials" that substantiate the asserted facts. Local Rule 56.1(a)(3); *F.T.C. v. Bay Area Business Council, Inc*., 423 F.3d 627, 633 (7th Cir. 2005).

The party opposing summary judgment must then respond to the movant's statement of proposed material facts; that response must contain both "a response to each numbered paragraph in the moving party's statement," Local Rule 56.1(b)(3)(B), and a separate statement "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment," Local Rule 56.1(b)(3)(C); *Ciomber*, 527 F.3d at 643. Again, each response, and each asserted fact, must be supported with a reference to the record. Local Rule 56.1(b)(3)(B); *Cracco v. Vitran Exp., Inc*., 559 F.3d 625, 632 (7th Cir. 2009); *Bay Area Business Council, Inc*., 423 F.3d at 633.

The district court is entitled to enforce strict compliance with its local rules regarding summary judgment motions. *Yancick v. Hanna Steel Corp*., 653 F.3d 532, 537 (7th Cir. 2011); *Schmidt v. Eagle Waste & Recycling, Inc.,* 599 F.3d 626, 630 (7th Cir.2010). Responses and facts that are not set out and appropriately supported in an opponent's Rule 56.1 response will not be considered. *See Shaffer v. American Medical Association*, 662 F.3d 439, 442 (7th Cir. 2011); *Bay Area Business Council*, 423 F.3d at 633. As a result, the movant's properly supported facts will be deemed admitted. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013).

## C.
### Facts

We don't know exactly when the relationship between PMC and Princeton began. According to Princeton's office manager from 2003 through 2012, Kendall Knapik, PMC began to order parts for machine gun mounts from Princeton "[i]n March" – she does not say in what year. [Dkt. # 78-1, ¶ 5]. In its amended complaint, Princeton says it was March of 2009. [Dkt. # 12, ¶ 7]. In its statement of facts, it asserts it was March of 2008. [Dkt. # 78, ¶5]. Ultimately, the year doesn't really matter.

In any event, PMC needed the parts because it had a machine gun mount contract with the U.S. Army. [Dkt. #78, ¶ 6]. When PMC needed parts, PMC would obtain a quote from Princeton; if it was acceptable, PMC would send Princeton its order by email or fax. [Dkt. # 78, ¶¶ 7, 8]. Princeton says that ordering was done by "purchase orders or other documents." [Dkt. #78, ¶ 7]. PMC submits that, according to both its and Princeton's internal procedures, purchase orders were required. [Dkt. #91, ¶¶ 7, 25, 36, 45, 55, 63, 71, 79, 87; Dkt. #82-1]. Purchase orders included a warning that the "terms of this order shall not be changed or modified in any way except by written instrument signed by an authorized representative of the purchaser . . . ." [Dkt. # 83, ¶ 7].

Princeton would include an invoice for the parts shipped with each shipment. [Dkt. # 78, ¶ 9]. Each invoice stated the quantity of parts shipped, the part number of the parts shipped, and the applicable purchase order. [Dkt. # 78, ¶ 9]. Princeton also sent a copy of the invoice by U.S. mail. [Dkt. # 78, ¶ 9]. Every invoice warned "[a]ll claims for shortages or rejections must be made by the buyer [PMC] within 15 days after receipt of material. No material may be returned without

authorization." [Dkt. # 78-1, at 30-246; Dkt. # 91, ¶9].

There are nine parts involved in the dispute in this case. The general pattern of the orders of these parts was the same. In January 2009, PMC ordered 10,000 of all except one of the parts. [Dkt. # 78, ¶¶17, 26, 37, 46, 56, 64, 72, 80]. In about half of these orders, 5,000 of each type of part were to be delivered in installments from February to September of 2009. [Dkt. # 78, ¶¶18, 27, 38, 47]. In those instances, the purchase orders stated that the delivery schedule for the second installment of 5,000 parts was "to be determined." [Dkt. # 78, ¶¶ 19, 28, 39, 48]. As for all but one of the remaining types of parts, delivery was to be in installments from March 2009 through July 2009. [Dkt. # 78, ¶¶57, 65, 73, 81]. On April 8, 2010, PMC sent Princeton a schedule showing the delivery dates for some of the remaining parts, the number varying depending on the part. [Dkt. # 78, ¶¶ 21, 32, 41, 51, 58, 66, 74, 82; Dkt. # 78-1, at 18].

On July 21, 2010, at 1:31 p.m., Princeton's Kendall Knapik sent Rose Schleifer of PMC an email asking when they would be getting new orders and what the production schedule was after August. [Dkt. #82-1, at 11]. Ms. Schleifer (PMC) wrote back at 1:55, saying she was working on the schedule and would try to get it to her the next day. New orders would be ready early the next week. [Dkt. # 82-1, at 12]. Then, at 3 p.m., Ms. Schleifer (PMC) sent the following an email to Ms. Knapik (Princeton):

Attached is the schedule from Jun-Dec.  Let me know if there will be any problems meeting this schedule.

| PO# | | PRINCETON INDUSTRIAL PRODUCTS | | Jun | July | Aug | Sept | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|
| 14465 | 6108317 | Screw, Elevating | FN: 3-22-17 | 900 | 900 | 1150 | 1200 | 1200 | 1200 | 1200 |
| 12732 | 6195550 | Sleeve, Elevating | FN: 3-22-50 | 900 | 900 | 1150 | 1200 | 1200 | 1200 | 1200 |
| 12732 | 5174125 | Screw, Traversing | FN: 3-22-25 | 900 | 900 | 1150 | 1200 | 1200 | 1200 | 1200 |
| 13770 | 5140237 | Screw | FN: 2-1-1-6/2-2-4 | cmplt | | | | | | |
| 13763 | 5140383 | Screw, Locking | FN: 3-26 | cmplt | | | | | | |
| 13769 | 11010522 | Pin, Straight Headless | FN: 3-15 | cmplt | | | | | | |
| 14495 | 6166552 | Screw, Elevating | FN: 3-22-52 | 900 | 900 | 1150 | 1200 | 1200 | 1200 | 1200 |
| 13976 | 12972429-2 | Detent Pin | FN:1-2-3-4 | 900 | 900 | 1150 | 1200 | 1200 | 1200 | 1200 |
| 13976 | 12972429-1 | Detent Pin | FN: 1-2-4-5 | 900 | 900 | 1150 | 1200 | 1200 | 1200 | 1200 |
| 13976 | 12972429-3 | Detent Pin | FN: 1-5-4 | 900 | 900 | 1150 | 1200 | 1200 | 1200 | 1200 |
| 13976 | 6650757 | Detent Pin | FN: 1-5-5 | 900 | 900 | 1150 | 1200 | 1200 | 1200 | 1200 |
| 13976 | 12972429-1 | Detent Pin | FN: 4-3 | 900 | 900 | 1150 | 1200 | 1200 | 1200 | 1200 |
| 13935 | 6650493 | Screw (body) Insert | FN: 2-2-2 | cmplt | | | | | | |
| 13935 | 6650494 | Screw (arm) Insert | FN: 2-1-1-5 | cmplt | | | | | | |

Thank you,
Rose Schleifer
Buyer
**Precision Metals Corp**
221 Skip Lane, Bay Shore, NY 11706
631-586-5032 Fax 631-586-4922
www.precisionmetalscorp.com
A Service Disabled Veteran Owned Small Business

1

[Dkt. #12-2].  As can be seen, Ms. Schleifer informed Ms. Knapik, "Attached is the schedule from Jun-Dec. Let me know if there will be any problems meeting this schedule." [Dkt. # 12-2].  As can also be seen, the email included a chart, which listed purchase order numbers, part numbers, and quantities to be delivered in each of the months from June to December. [Dkt. #12-2]. The chart showed delivery dates for the remainder of the originally ordered parts and listed and scheduled delivery of parts in excess of the number originally ordered.  [Dkt. #12-2; Dkt. # 78, ¶¶ 25, 36, 45, 55, 63, 71, 79, 87].

For example, the first line of the chart in the July 21, 2010 email refers to part #6108317 ("part 317").  Originally, on January 8, 2009, PMC ordered 10,000 of part 317 (purchase order 12732).  [Dkt. #12-2, at 4; Dkt. # 78, ¶26].  On May 13, 2009, after 1,992 of those parts had been

delivered, the parties replaced purchase order 12732 with a new purchase order (14465), which indicated that the remaining 7,746 pieces needed to be made of "stress proof" material. [Dkt. #12-2, at 11; Dkt. # 78, ¶ 29]. Purchase order 14465 (unlike most of the other purchase orders) also provided a schedule for delivery of all parts. [Dkt. #12-2; Dkt. # 78, ¶ 30]. The April 8, 2010 email gave new delivery dates for some of the remaining pieces covered by purchase order 14465. Dkt. # 78, ¶ 32; Dkt. # 78-1, at 14].

By July 21, 2010, 5,014 pieces of Part 317 had been delivered to PMC. [Dkt. # 78, ¶ 34; Dkt. # 78-1, at 14]. The July 21, 2010 email, however, requested a total of 6,850 more parts to be delivered for the months of June 2010 through December of 2010. [Dkt. # 12-2, 78, ¶ 34; Dkt. # 78-1, at 14]. Thus, the total number of part 317 ordered had increased to 11,864. On August 20, 2010, PMC sent purchase order 16707 [Dkt. 12-1, at 13] for another 2,000 of part 317, bringing the order total to 13,894. [Dkt. # 78, ¶¶ 35, 36]. Princeton ultimately shipped – and PMC received – 13,211 of part 317, with PMC picking up the last shipment on September 29, 2011. [Dkt. #78, ¶¶15, 36].[1]

By October 2010, just three months after the July 21, 2010 email, the number of pieces of Parts 125 and 429-3 exceeded 10,000 pieces, and by November 2010, PMC had received over 10,000 of most of the parts. [Dkt. # 78, ¶¶43, 69, 77, 85]. It is undisputed that Princeton continued to ship, and PMC continued to accept, the parts listed in the July 21, 2010 email until September 29,

_____

[1] All of the other parts follow a similar pattern. The order and delivery history for each part is shown in Princeton's Local Rule 56.1 statement at ¶¶17-90. Princeton included an invoice for the parts shipped with each shipment, and sent a duplicate invoice to PMC via U.S. mail. [Dkt. #78, ¶ 9]. Ultimately, there were new documents entitled "Purchase Order" for four of the parts shown on the July 21, 2010 Email (Parts 429-1, 429-2, 429-3 and 757) but the July 21, 2010 email was the only document sent for other parts. [Dkt. # 78, ¶¶62, 70, 78, 86].

2011 – almost one year after PMC began receiving additional parts listed in the July 21, 2010 email. [Dkt. # 78, ¶12; Dkt. # 91, ¶ 12]. Initially, Princeton arranged the shipping, but in approximately December of 2010, PMC had fallen behind in its payments, and Princeton insisted that PMC arrange for its own shipper to pick up the additional parts. [Dkt. # 78, ¶13]. That went on for about nine months.

Ms. Knapik (Princeton) emailed Ms. Schleifer (PMC) on December 10, 2010, telling her that Princeton would be shipping the final release of all open purchase orders in its next pallet, amounting to 1200 pieces. [Dkt. # 82-1, at 13]. On December 13, 2010, Ms. Schleifer emailed Ms. Kendall, informing her that there were "still open balances" on some orders and attached a spreadsheet with the pertinent orders highlighted. And she asked whether those open balances would be taken care of in the final shipment. [Dkt. # 82-1, at 13].[2]

In his June 5, 2015 affidavit, Tom Figlozzi, PMC's vice president, states that, sometime in November or December of 2010, he had a telephone conversation with Princeton employee Al Schreiber in which he offered to return the overshipped items, but that Mr. Schreiber suggested that he could simply keep the overshipments "in anticipation of future government contracts." [Dkt. # 91, ¶ 14; Dkt. # 86, ¶¶ 4-6]. That's what PMC did, although, as it turned out, there were no further government contracts, as the contract expired without renewal. *Id.* Mr. Schreiber passed away in February 2015, four months before Mr. Figlozzi's affidavit. [Dkt. # 100, at 9].

---

[2] On the document filed as an exhibit, no orders appear to be highlighted. However, in the column captioned "Open", it is clear how many parts short certain orders are. There are also a number of orders with a negative open number, meaning that more parts were shipped than ordered in those instances. PMC contends that these entries ought to have put Princeton on notice of overshipments, although Ms. Schleifer made no mention of this in her email. She expressed concern only with open orders. [Dkt. #91, ¶ 14].

Ms. Schleifer (PMC) sent Ms. Knapik (Princeton) another email on May 3, 2011, https://ecf.ilnd.uscourts.gov/doc1/067115923688, again pointing out orders with open balances. She again asked when those orders would be filled. And, as before, she attached a spreadsheet, which indicated "negative" open balances, but she made no mention or reference to any overshipments. [Dkt. # 82-1, at 15]. PMC continued to have its shipper pick up parts for an additional five months, until September 29, 2011. [Dkt. # 78, ¶15].

It was not until February 29, 2012, that Deanna Wendt of PMC emailed Princeton to say that certain part numbers had been overshipped. [Dkt. # 78, ¶16; Dkt. #78-1, at 8-9]. Although she attached a chart to her email, the chart does not state the number of parts PMC contends that it actually ordered or the number of parts it contends were shipped to PMC; it indicates only the invoice number and quantity overshipped. [Dkt. # 78, ¶16; Dkt. #78-1, at 9].

## II.
## ANALYSIS

### A.

The parties agree that the original purchase orders constituted valid contracts and could only be modified in accordance with U.C.C. § 2-209. [Dkt. #77, at 7-8; Dkt. # 92, at 2-4]. Princeton thinks Ms. Schleifer's July 21, 2010 email constituted such a modification. PMC thinks it didn't, because it says it was not a "signed" writing.

U.C.C. §2-209 provides as follows:

Modification, Rescission and Waiver.
(1) An agreement modifying a contract within this Article needs no consideration to be binding.

(2) A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party.

(3) The requirements of the statute of frauds section of this Article (Section 2-201) must be satisfied if the contract as modified is within its provisions.

810 ILCS 5/2-209. Thus, the warning about modifications in the purchase orders tracks the applicable Illinois U.C.C. provision. The statute of frauds section, in turn, requires that "there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent . . . ." 810 ILCS 5/201(1).

The email at issue, of course, ends with a standard email signature block that includes the name of the sender – "Rose Schleifer" – her position – "Buyer" – with "Precision Metals, Corp." and the company's address, phone number, fax number, and company email address. For Princeton, this rules the day – it was in writing and signed by a PMC agent. It points – oddly consigning the support for its position to a footnote – to the Electric Signatures in Global Commerce Act ("ESIGN Act"), which provides that "a signature or contract or other recording relating to such transaction cannot be denied legal effect solely because it is in electronic form." 15 U.S.C. 7001(a)(1). The ESIGN Act further provides that an "electronic signature" is "a . . . symbol . . . attached to a contract or other record . . . executed or adopted by a person with the intent to sign the record." 15 U.S.C. 7006(5).

Then, of course, there is the Seventh Circuit's decision in *Cloud Corp. v. Hasbro*, 314 F.3d 289, 295 (7th Cir. 2002). PMC's brief ignores the holding in *Cloud Corp*. which, in addition to being mentioned in a footnote in Princeton's brief, was referenced in the Opinion denying PMC's motion

for summary judgment [Dkt. # 67, at 3] – operating under the mistaken assumption that "Illinois is one of four states that has not adopted the  Federal Esign Act [ESIGN]." [Dkt. #92, at 4 n.1].  But, as the ESIGN Act applies to "all transactions in or affecting interstate commerce," 15 U.S.C. §1701, it clearly applies to a transaction between an Illinois company and a New York company.[3]  PMC is confusing the ESIGN Act with the Uniform Electronic Transactions Act.  *See U.S. Life Ins. Co. v. Wilson*, 198 Md. App. 452, 480, 18 A.3d 110, 126 n.5 (2011)(noting that Illinois has not adopted the UETA but has gone with it's own similar version).  Illinois's version of the UETA, its Electronic Commerce Security Act, has been in effect since 1999, 5 ILCS 175/1-101, meaning it was in effect when Judge Posner penned the opinion in *Cloud Corp.,* it which the court held that, ESIGN Act or not, "the sender's name on an e-mail satisfies the signature requirement of the statute of frauds." 314 F.3d at 296.  And so, "there was adequate evidence of written consent to the modification [of the contract]." 314 F.3d at 297.  Why would the email from Ms. Schleifer not amount to the same here?

PMC seems to argue that it does not because it does not comply with Illinois's Electronic Commerce Security Act, which provides that a signature can be "any symbol executed or adopted, or any security procedure employed or adopted, using electronic means or otherwise, by or on behalf of a person with intent to authenticate a record."  5 ILCS 175/5-105.  That's not meaningfully different than the requirement of the ESIGN Act that the Seventh Circuit concerned itself with in *Cloud Corp.* (and perhaps that's one reason why it did not specifically concern itself with Illinois's

---

[3] The ESIGN Act allows for limited circumstances in which a state may "modify, limit, or supercede" its provisions. 15 U.S.C. §7002.  But there is no indication that Illinois has undertaken to do so. Indeed, as explained *infra*, Illinois's own statute's definition of an electronic signature is essentially the same as the ESIGN Act's.

Electronic Commerce Security Act).[4]   Under *Cloud Corp.*, a name on an email satisfies the requirement of a signed writing to modify a contract.

PMC is adamant, however, and asserts that Ms. Schleifer's email "only contains the standard contact information block" and was not "overtly typed" by her, but "automatically generated by her email system." [Dkt. #92, at 4].   PMC contends, without any evidence to support it, that Ms. Schleifer "had no intention of authenticating" the email. [Dkt. # 92, at 4].   But, PMC goes on to submit – or, perhaps more accurately for our purposes here, to concede – that "[s]aid contact block appears on *all* of Ms. Schleifer's emails." [Dkt. #92, at 4] (emphasis supplied).  So, to put it another way, that "contact block" identifies the email as coming from Ms. Schleifer, a person with authority to bind PMC, and not from someone else.  In other words, it shows that the email was not a forgery. It authenticates it as Ms. Schleifer's writing.  And that's the point.

It would seem that, for PMC, nothing can be done through email unless the individual sending the email goes through the physical process of typing her name at the bottom.  Its not clear how a recipient or anyone could distinguish between a physically keystroked name and one that is attached to the sender's email automatically.  So, for PMC, all electronic commerce would be held hostage to swearing contests over whether an individual typed their name or it was generated automatically by their email account.  One might say that's ridiculous or, as Judge Cardozo more artfully put it in regards to the statute of frauds:

> The statute must not be pressed to the extreme of a literal and rigid logic. Some compromise is inevitable if words are to fulfill their function as symbols of things and of ideas. How many identifying tokens we are to exact, the reason and common

---

[4] The same goes for the U.C.C., which defines the word "signed" as including "any symbol executed or adopted by a party with present intention to authenticate a writing." 810 ILCS 5/2–201.

sense of the situation must tell us.

*Marks v. Cowdin*, 226 N.Y. 138, 143-144, 123 N.E. 139, 141 (1919). History – as well as reason and common sense – tells us we have sufficient identifying tokens here.

Before business was regularly conducted by email, the Seventh Circuit had little difficulty finding a writing on a company's preprinted letterhead satisfied the signed writing requirement. *Monetti, S.P.A. v. Anchor Hocking Corp.*, 931 F.2d 1178, 1185 (7th Cir. 1991). *See also Perricci v. Systems Assessment & Research, Inc.*, 2011 WL 5974605, *7 (D.Md. 2011)(writing on company letterhead with printed name and title of the writer satisfied the statute of frauds); *MFS & Co., LLC v. Caterpillar, Inc.*, 2011 WL 4693897, *5 (E.D.Mich. 2011)(purchase order on company's letterhead constituted writing signed by the company); *Automotive Spares Corp. v. Archer Bearings Co.*, 382 F.Supp. 513, 515 (D.C.Ill. 1974)("The facts show that [defendant] sent the document bearing its letterhead containing the essential terms. This conduct is more convincing than the fact that the document does not contain a formal signature."). The signature block at the end of an email, whether typed by Ms. Schleifer or generated automatically by her email program is not discernibly different.

Through all this, it must be remembered that intent to authenticate can be actual or *apparent*. Restatement (Second) of Contracts § 134 (1981). *See also Reinagel v. Deutsche Bank Nat. Trust Co.*, 735 F.3d 220, 227 n.19 (5th Cir. 2013); *Flight Systems, Inc. v. Electronic Data Systems Corp.*, 112 F.3d 124, 129 (3rd Cir. 1997); *Just Pants v. Wagner*, 247 Ill.App.3d 166, 173, 617 N.E.2d 246, 251 (1st Dist. 1993)(". . . a writing has been considered 'signed' for the purpose of the statute even if it merely contains something which manifests that the instrument has been executed . . . by the

party to be charged by it. "); *Hamdi Halal Market LLC v. U.S.*, 947 F.Supp.2d 159, 164 (D.Mass.

2013)("The law demands only demonstration of a person's intent to authenticate a document as her

own in order for the document to be signed. Many symbols may demonstrate this intent."); *White*

*v. BAC Home Loans Servicing, LP*, 2011 WL 4479299, 7 (N.D.Ga. 2011); *Overman v. Minnwest*

*Bank South*, 2008 WL 2574461, *2 (Minn.App. 2008); *In re Bross*, 2006 WL 2381542, *4

(S.D.Ohio 2006); *Bradley v. Dean Witter Realty, Inc.*, 967 F.Supp. 19, 27 (D.Mass. 1997).[5]  Thus,

contrary to what PMC seems to be driving at, Ms. Schleifer's intent can be satisfied and shown

without her having to testify at a trial.  Otherwise, most signatures on most contracts, electronic or

otherwise, would have to be tested at trial. And every contractual obligation could be avoided; in

other words, fraud could be accomplished by the "extreme . . . literal and rigid" application of the

statute of frauds that PMC appears to be espousing.

### B.

But the resolution of this matter need not rest on Ms. Schleifer's email signature block alone.

PMC next argues that, assuming it accepted the additional goods that Princeton shipped in reliance

on the email, it revoked its acceptance.  [Dkt. # 92, at 5].  Under U.C.C. §2–608:

> The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it
>
> > (a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

---

[5] It should also be pointed out that, under Illinois law regarding the interpretation of contracts, it is the objective manifestation of intent that matters, not subjective intent. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 966 (7th Cir. 2013); *Citadel Group Ltd. v. Washington Regional Medical Center*, 692 F.3d 580, 588 (7th Cir. 2012).

> (b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

> (2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

810 ILCS 5/2-608. PMC argues that it informed Princeton about the overshipments in a timely fashion but that Princeton gulled it into accepting the overshipments.

In the way of evidence to support this contention, PMC relies principally on the recollection of a phone conversation its vice president, Mr. Figlozzi, claims to have had with a Princeton employee sometime in November or December of 2010 – PMC's vice president can't recall when. Supposedly, in that conversation, the PMC's vice president offered to return the excess parts but the PMC employee suggested PMC simply keep them to fill future government orders. PMC's vice president thought this was a fine idea and that's what PMC did. The Princeton employee, Mr. Schreiber, is dead and there are some real hurdles to negotiate with this evidence; those hurdles are insurmountable.

On February 6, 2014, Princeton served PMC with its first set of interrogatories, the seventh of which asked PMC to "identify all communications between Plaintiff and Defendant relating to the purchase orders and revised purchase orders." [Dkt. # 100-1, at 8]. PMC responded in April 2014, making no mention of any conversation between Mr. Figlozzi and Mr. Schreiber. The only conversations it identified were between Ms. Schleifer and Ms. Knapik. [Dkt. #100-2, at 7]. Mr. Schreiber passed away in February of 2015. The first time PMC asserted there had been any

15

November/December 2010 conversation between Mr. Figlozzi and Mr. Schreiber was in June 2015, in response to Princeton's motion for summary judgment. Notably, PMC filed its own motion for summary judgment in December 2014 and made no reference to any such conversation in its memorandum or its Local Rule 56.1 statement. All PMC stated was that it had offered to return the parts but Princeton declined, with no indication of how or when such an offer might have been made. That assertion was confined to its brief and was not a part of its Local Rule 56. 1 submission.

Even more notably, in their supporting memorandum, PMC asserted that the earliest that Princeton was on notice that it had overshipped parts was May 3, 2011 [Dkt. # 47, at 10][6] – not six or seven months earlier when Mr. Figlozzi now claims to have had his conversation with Mr. Schreiber. That constitutes a judicial admission, binding on PMC. *Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 872 (7th Cir. 2010)("A judicial admission is a statement, normally in a pleading, that negates a factual claim that the party making the statement might have made or considered making. . . . in order to qualify as judicial admissions, an attorney's statements must be deliberate, clear and unambiguous.").

That's one hurdle PMC can't negotiate. Another is that, under Fed.R.Civ.P. 37(c)(1), the exclusion of non-disclosed evidence is "mandatory under Rule 37(c)(1) unless non-disclosure was

---

[6]In that filing, PMC stated that "*[a]s early as* May 3, 2011, Plaintiff Princeton was on notice that they had produced parts in excess of the purchase orders. On that date, Rose Schleifer e-mailed Kendall Knapik, attaching a spreadsheet showing open orders, including parts received by PMC from Princeton in excess of Purchase Orders . . . ." At the time of the filing, PMC also filed an affidavit from Mr. Figlozzi but, as it was not referred to in its statement of facts, it was not properly part of the record and not considered. *Bay Area Business Council.*, 423 F.3d at 633; *Koszola v. Board of Educ. of City of Chicago*, 385 F.3d 1104, 1108-09 (7th Cir. 2004). But no matter; in his earlier affidavit, Mr. Figlozzi stated only that PMC offered to return the overshipment of parts. He neither gave any time frame for that offer nor mentioned any conversation. [Dkt. #49]. As such, the only reasonable inference to be drawn would have been that the offer came some time after the May 3, 2011 email. The time of any purported revocation is, of course, the salient issue here.

16

justified or harmless." *Rossi v. City of Chicago*, – F.3d –, –, 2015 WL 3827324, *7 (7th Cir. 2015); *Musser v. Gentiva Health Servs.,* 356 F.3d 751, 758 (7th Cir. 2004). Non-disclosure here is clearly not harmless. And, worse still, PMC is on record as stating that the earliest it mentioned overshipments to Princeton was May 2011 – not November 2010. Yet, PMC kept this recalled conversation to itself for well over a year after being asked about it. With the passing of Mr. Schreiber in February 2015, Princeton has no meaningful way to counteract this evidence. And it's certainly not justified. The conversation, or more accurately, the recollection of it and when it occurred, is the centerpiece of PMC's case and certainly the linchpin in its theory that it revoked acceptance of the overshipped goods. It comes, not from some low-level employee who might have escaped the attention of PMC's attorneys during case preparation, but from *the company vice president*. Significantly, no explanation for its belated disclosure is even attempted. The evidence must be excluded.

But, for the sake of argument, let's say that PMC mentioned the conversation in its response to Princeton's interrogatories or, at least, supplemented its response in a timely fashion under Fed.R.Civ.P. 26(e). And let's also say that PMC hadn't already argued that the earliest it informed Princeton of the overshipments was six or seven months after the purported conversation. And let us further assume that PMC had followed Local Rule 56.1 when it submitted Mr. Figlozzi's first affidavit, and that Mr. Figlozzi actually mentioned the conversation and time frame in that filing. Still, the question remains, what is the legal significance of his claimed conversation with Mr. Schreiber? Unfortunately for PMC, the answer is none.

Mr. Figlozzi says he offered to return the overshipped parts, but decided to keep them when Mr. Schreiber suggested he might use them to fill future government contracts. But that is plainly

not a revocation, but rather a volitional, business decision by PMC to accept the overshipped parts with the plan to apply them to future government orders – should there be any. Moreover, PMC did not just hang on to the parts Mr. Figlozzi supposedly told Mr. Schreiber about. It continued to *pick up* parts – remember, Princeton had stopped shipping parts in December 2010 – for nearly a year after the alleged conversation between Mr. Figlozzi and Mr. Schreiber. PMC wasn't just passively receiving overshipments, it was actively pursuing them. It clearly hadn't revoked acceptance. *See United States v. HydroAire, Inc*., 1997 WL 160761, 12 (N.D.Ill. 1997)("Although the return of goods following a revocation of acceptance is not always a prerequisite to successful revocation, in most instances . . . goods should be returned."); *Lakeside Feeders, Ltd. v. Chicago Meat Processors, Inc*., 1996 WL 396086, 3 (N.D.Ill. 1996)(". . . the notice of revocation of the buyer's acceptance need not be in any particular form or in any particular phrasing, provided that the buyer adequately informed the seller that he does not want the goods.")

Nonetheless, PMC argues that it was Mr. Schreiber's "assurance" that induced it to continue to keep – and pick up – overshipments. [Dkt. # 92, at 6]. Precisely how Mr. Schreiber was in a position to "assure" PMC that it would be getting additional government contracts, PMC does not explain. Nor could it. Nor does it explain how it could have "reasonably" relied on that assurance, as the law requires. Mr. Schreiber, like other men, was not endowed with the gift of prophecy, *Ballard v. Cit. Cas. Co.,* 196 F.2d 96, 102 (7th Cir.1952); *In re Sulfuric Acid Antitrust Litigation,* 231 F.R.D. 320, 324 (N.D.Ill. 2005) and could not forecast events "still in the womb of time...." *Dennis v. United States*, 341 U.S. 494, 551 (1951)(Frankfurter, J., concurring) – at least not an event that hinges on the Government's decision to renew a contract with a supplier.

Mr. Schreiber's statement is not the kind of assurance §2-608(1)(b) contemplates in any

event.  The provision deals with a situation where the buyer has accepted goods "*without discovery* of [their] non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances."  810 ILCS 5/2-608(1)(b)(emphasis supplied).  As the Comment to the section explains, "[t]he reason for recognizing such assurances is that they induce the buyer to delay discovery. These are the only assurances involved in paragraph (b)." 810 ILCS 5/2-608(1)(b)(Comment 3).  Here, the non-conformity was overshipment, and PMC does not claim that it accepted the goods without having discovered it.  In fact, it would have been obvious from the amounts on the invoices that accompanied the shipments.

The only other type of assurances that come into play under U.C.C. case law are, of course, a seller's assurances that it would cure a non-conformity or defect.  *See, e.g., North American Lighting, Inc. v. Hopkins Mfg. Corp*., 37 F.3d 1253, 1256-58 (7th Cir. 1994); *Sorce v. Naperville Jeep Eagle, Inc*., 309 Ill.App.3d 313, 321, 722 N.E.2d 227, 232 (2nd Dist. 1999).  As already noted, Princeton had no capacity to predict government contracts for PMC, and it would have been unreasonable to think otherwise.  The only assurance that Princeton could have made along such lines would have been to have said that it would take the overshipments back if no government contract were forthcoming.  But that's not what Mr. Figlozzi claims happened, and its not an argument Princeton makes.

With Mr. Figlozzi's claim excluded from evidence, all that is left are the emails from Ms. Schleifer to Ms. Knapik about open orders.  Although Ms. Schleifer attached a spreadsheet to these emails that indicated not only open orders but negative open orders, which meant overshipments, Ms. Schleifer made no reference to these overshipments in her emails, and gave no indication there was any problem.  Those emails cannot constitute revocation because, as the Comments to 810 ILCS

5/2-608 explain, in order for a revocation to be effective, "more will generally be necessary than the mere notification of breach . . . ." 810 ILCS 5/2-608 (comment 5). At most, the email here arguably gave Princeton notice that some parts had been overshipped.

It was not until the email of February 29, 2012, that PMC informed Princeton that it had overshipped certain parts. The email said: "see the attached list regarding all the part numbers that were overshipped." [Dkt. #78-1, at 8]. Again, in order to be effective, a revocation must do more than merely inform the seller of the non-conformity. And, in any case, by the end of February 2012, it was too late. A revocation must be made within a reasonable time or it is not effective. 810 ILCS 5/2-608(2). PMC asserts that the claimed February 29 "revocation" came within a reasonable time, but is unable to cite any case to support its position [Dkt. # 92, at 7] that the February 29, 2012 email, which came well over a year after overshipments had begun, came within a reasonable time.

The fact that parts were overshipped was easy to discover; it was not as though the non-conformity were some latent defect. The attempted revocation – if it may be called that – clearly came too late. *See, e.g., J.N.K. Mach. Corp. v. TBW, Ltd.*, 81 A.D.3d 1438, 1440, 916 N.Y.S.2d 718, 720 (4 Dept. 2011)(five months is too late); *Cliffstar Corp. v. Cape Cod Biolab Corp.*, 37 A.D.3d 1073, 1074-75, 829 N.Y.S.2d 779, 780 (4 Dept. 2007)(same); *L.J. Robinson, Inc. v. Arber Constr. Co.,* 292 A.2d 809 (D.C.1972) (rejection was ineffective where attempted two months after delivery); *Robinson v. Jonathan Logan Fin.,* 277 A.2d at 116 (rejection was ineffective where attempted six months after delivery); *Intervale Steel Corp. v. Borg & Beck Div., Borg–Warner Corp.,* 578 F.Supp. 1081, 1085–88 (E.D.Mich.1984), *aff'd without opinion,* 762 F.2d 1008 (6th Cir.1985) (rejection was ineffective where attempted three months after delivery); *In re First Hartford Corp.,* 63 B.R. 479, 487 (Bankr.S.D.N.Y.1986) (rejection was ineffective where attempted five months after

delivery); *Fabricators, Inc. v. Farmers Elevators, Inc.,* 277 N.W.2d 676, 678 (Neb.1979)(rejection was ineffective where no communication from buyer for three months after delivery).

## C.

PMC's final argument is that it rejected the goods.[7] Again, it relies on the evidence it claims supports its theory of revocation [Dkt. # 92, at 8-9] and, again, its theory fails for the same reasons its revocation theory did. The evidence regarding the purported conversation between Mr. Figlozzi and Mr. Schreiber must be excluded, and the emails from Ms. Schleifer to Ms. Knapik do not constitute timely rejections. As PMC concedes [Dkt. #92, at 8], a rejection must be made within the time agreed upon or it is ineffective. 810 ILCS 5/2-602(1)("Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller."); 810 ILCS 5/1-205(b)("An action is taken seasonably if it is taken at or within the time agreed or, if no time is agreed, at or within a reasonable time."); *Al Maha Trading & Contracting Holding Co. v. W.S. Darley & Co.*, 936 F.Supp.2d 933, 939 (N.D.Ill. 2013). Here, the agreed time was 15 days. [Dkt. #91, ¶ 9].

The emails PMC points to do not qualify as rejections since the earlier ones didn't even mention overshipments and the February 2012 one merely stated that some parts were overshipped

---

[7] In its response brief of a little over eight pages, PMC advances no arguments other than the email could not constitute a valid modification and that, even if it did, PMC rejected or revoked acceptance of the overshipped goods. As such, any other arguments it might have made are deemed waived. *See James v. Hyatt Regency Chi.,* 707 F.3d 775, 783 (7th Cir.2013); *Local 15, Int'l Bhd. of Elec. Workers v. Exelon Corp.,* 495 F.3d 779, 783 (7th Cir.2007).

and nothing more;[8] and they aren't effective in any event, coming as they did well after 15 days of

the shipments.[9]

## CONCLUSION

The plaintiff's motion for summary judgment on liability [Dkt. # 76] is GRANTED.


ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 8/17/15

---

[8] A rejection, however, must be clear and unambiguous; a mere complaint about non-conformity is not sufficient because the U.C.C. contemplates the opportunity for a cure by the seller. *Marmi E. Graniti D'Italia Sicilmarmi S.p.A. v. Universal Granite and Marble*, 757 F.Supp.2d 773, 779 (N.D.Ill. 2010); *Midwest Generation, LLC v. Carbon Processing and Reclamation, LLC.,* 445 F.Supp.2d 928, 933–34 (N.D.Ill. 2006). The emails don't satisfy that standard.

[9] Although PMC does not dispute the fact that rejections has to be made in 15 days per Princeton's invoices [Dkt. # 91, ¶ 9], and Princeton clearly argues this point in its opening brief [Dkt. # 77, at 10], PMC ignores this point in its response brief. [Dkt. #92, at 8-9]. We take this to be an implicit concession. *Gonzalez-Servin v. Ford Motor Co.,* 662 F.3d 931, 933 (7th Cir. 2011).